

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

---

DMB:MBM/WES                          *271 Cadman Plaza East*
F.#2008R000785                       *Brooklyn, New York 11201*

                                     November 26, 2010

The Honorable Frederic Block
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:  United States v. Eliyahu Ezagui
                     Criminal Docket No. 09-0185 (FB)

Dear Judge Block:

          The government submits this letter in response to the
Court's query at the sentencing conference held on November 19,
2010.  Specifically, the government herein addresses the issues
of loss calculation and sophisticated means under the United
States Sentencing Guidelines ("U.S.S.G.").

          As proven at trial, the defendant was a real estate
developer for many years in the Crown Heights section of
Brooklyn.  In particular, the defendant constructed two apartment
complexes: 605-633 East New York Avenue ("Kingston") and 770
Lefferts Avenue ("Lefferts").  (PSR ¶ 4.)  The defendant
perpetrated two fraudulent mortgage schemes with respect to these
apartments.

          First, the defendant offered apartments at these
complexes for sale to members of the Lubavitch Jewish community
prior to the apartments' construction.  The purchasers
(hereinafter, the "Residents") accepted the offers and paid the
defendant in full for their apartments.  After the Residents paid
for the apartments, the defendant gave the Residents the keys to
their apartments and assured them that he would thereafter give
them the deeds.  (PSR ¶¶ 5, 6.)  It is uncontested by the
defendant that the Residents are legally entitled to the deeds
for the properties, and are the proper owners of the properties.
Unbeknownst to the Residents, however, the defendant then paid
others (hereinafter, the "Straw Borrowers") to obtain mortgages
on the same apartments - apartments which the defendant no longer
owned.  The defendant then received the mortgage proceeds at or
near the time of the closing from the financial institutions.
The Straw Borrowers, with no true interest in the properties,

ultimately defaulted on the mortgages in 2007, and the properties are currently in foreclosure proceedings.  (PSR ¶¶ 8-9.)

Second, the defendant and the Straw Borrowers also assumed numerous mortgages on other, previously unsold apartments.  The defendant represented to the financial institutions that the apartments were being sold to the Straw Borrowers, and that the purchase price for each apartment was $425,000, well beyond the true purchase price of the apartments at the time (approximately between $100,000 and $185,000).  By doing so, the defendant obtained mortgages at amounts far greater than that which he would have otherwise been able.

The government herein addresses the loss amount from the first part of the scheme, which consists of the mortgages taken out by the defendant and the Straw Borrowers on the Residents' properties, as well as the application of the sophisticated means enhancement.

I.   Loss Calculation Pertaining to the Residents' Apartments

Loss calculation under § 2B1.1 of the Sentencing Guidelines ("Guidelines") is valued by determining the greater of either "actual loss" or "intended loss" to the victim.  U.S.S.G. § 2B1.1, cmt. 3(A).  "Actual loss" is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. 3(A)(i).  A sentencing court is not required to compute the loss resulting from a fraud offense "with precision."  United States v. Jacobs, 117 F.3d 82, 95 (2d Cir. 1997).  Instead, "[t]he court need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1, cmt. n.3 (1998).

Here, the loss to the Residents is the total amount of the mortgages assumed by the defendant and his accomplices on their homes.  The Residents purchased their apartments not knowing that the defendant had assumed or would assume liens on their apartments.  Rather, the Residents negotiated for and purchased the apartments from the defendant free and clear of any encumbrances.  As such, the Residents are entitled to clean, unencumbered title to their property.  The "reasonably foreseeable pecuniary harm" to the victims is therefore the current encumbrance on their properties, imposed by the defendant without their knowledge.

Explained another way:

A fraud may involve the misrepresentation of

> the value of an item that does have some
> value (in contrast to an item that is
> worthless). Where, for example, a defendant
> fraudulently represents that stock is worth
> $40,000 and the stock is worth only $10,000,
> the loss is the amount by which the stock was
> overvalued (i.e., $30,000).

United States v. Leonard, 529 F.3d 83, 92 (2d Cir. 2008) (quoting U.S.S.G. § 2F1.1 cmt. n.8(a) (2000)).  Here, the defendant represented that the victims would obtain clean title to the apartments they purchased.  Instead, the defendant encumbered title by taking out fraudulent mortgages.  The total amount of those mortgages, therefore, represents a loss to the Residents.

       To the extent that the defendant argues that the Residents' loss has been reduced by an increase in market value since 1998, this argument is without merit.  In United States v. Thaler, 706 F. Supp. 2d 361 (S.D.N.Y. 2009), for example, the district court explicitly found that the loss amount in a fraudulent real estate transaction should be determined based upon the victim's reduction in equity.  In that case, the defendant acted as the victim's real estate attorney in facilitating a home purchase for $160,000, without disclosing to the victim that he had purchased the same home for $80,000 the previous day.  Id. at 363-64.  The defendant argued that "because the 'fair market value' of the property obtained by the victim exceeded the amount she paid for it, no loss occurred."  Id. at 370 & n.4.  The district court rejected this argument, holding that "no matter how much more the house might have been worth than the purchase price [the victim] paid, the evidence clearly supports the conclusion that [the victim] paid $80,000 more for the house because of [the defendant's] corrupt and fraudulent conduct, thus reducing the victim's] equity in the property by that amount."  Id. at 370-71.  The same reasoning applies with even greater force to this case.  The Residents are now forced to expend the full amount of the liens in order to obtain that to which they were originally entitled – clean title to their apartments.  The Residents' equity in the apartments has been reduced by the full amount of the defendant's fraudulent liens.  Therefore, the total amount of the fraudulent mortgages taken out by the defendant on the Residents' apartments should be calculated as part of the loss calculation for the purpose of U.S.S.G. § 2B1.1.

       The defendant argues further that the Residents' losses should be reduced by the value they obtained from having access

to the apartments between 1998 and the present.  This argument is
frivolous.  Whether or not the market value of the apartments has
increased since their purchase in 1998 in of no relevance to the
harm caused by the defendant, any more than he would be
chargeable with a greater loss if the market value had declined.
See United States v. Fiorito, No. 07-CR-0212(1), 2010 WL 1507645,
at *12 (D. Minn. Apr. 14, 2010) ("Fiorito further contends that
he should receive credit for periods when some of his victims
lived in their houses without paying rent or a mortgage.  This
argument is frivolous to the extent that it is made about victims
whose houses Fiorito did not own.").  The Residents purchased the
apartments in approximately 1998.  As owners, they were entitled
to use the apartments without paying rent.  By living in their
apartments, they obtained no benefit beyond that to which they
were already entitled as homeowners.  The loss caused by the
defendant's fraudulent mortgages is not lessend in any way by the
fact that the Residents actively lived in, or rented out, the
apartments they actually purchased.

II.  Sophisticated Means Enhancement

        With respect to the issue of "sophisticated means,"
U.S.S.G. § 2B1.1(b)(9)(C), raised by the Court at the sentencing
hearing, the government believes the Guidelines calculation
should be amended by adding two points for this enhancement.
Application Note 8 explains that "sophisticated means" involves
an "especially complex or especially intricate offense conduct
pertaining to the execution or concealment of an offense."  The
Note goes on to explain that "[c]onduct such as hiding assets or
transactions, or both, through the use of . . . corporate shells
. . . also ordinarily indicates sophisticated means."  Even where
a defendant took actions which, on their own, were not
necessarily sophisticated, "sophisticated means" may apply based
upon the extent of coordination of such measures.  See United
States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003) ("[E]ven if
each step in the scheme was not elaborate, the total scheme was
sophisticated in the way all the steps were linked together . . .
."); United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996)
(holding, in tax case, that the sophisticated means enhancement
applied even when "each step in the planned tax evasion was
simple, [because] when viewed together, the steps comprised a
plan more complex than merely filling out a false tax return.")

        In this case, the defendant's scheme surpassed simply
filing false mortgage documents.  As detailed at trial, the
defendant's scheme lasted nearly ten years, and involved the
collusion of attorneys and mortgage brokers, the coordinated use

of numerous straw buyers, and numerous false statements to the banks designed to conceal the scheme from the underwriters at the banks.  Indeed, the defendant's fraud included a scheme to systematically artificially inflate the value of the properties by using a fabricated purchase price of $425,000 over the course of many years and dozens of mortgages.  In addition, the scheme involved a corporate shell, Votay Mamash, through the accounts of which most of the fraudulently obtained mortgage money passed to other entities controlled by the defendant, and numerous payments to hide the scheme from the Residents and the financial institutions.  Courts have found that similar mortgage fraud schemes using such sophisticated means result in the two point enhancement.  See United States v. Amico, 416 F.3d 163, 169-70 (2d Cir. 2005) (sophisticated means enhancement applied where, inter alia, defendant attempted to prevent detection of scheme by creating false bank documents, solicited and created false appraisals, and colluded with attorney representing many of the purchasers at the closing); see also United States v. Halloran, 415 F.3d 940 (8th Cir. 2005) (sophisticated means enhancement applied where defendant's scheme involved a series of false property transfers using false identifications, a corporate front, and fraudulent documents).  Clearly, "more than routine planning was involved" in the defendant's scheme, and the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(C) is warranted.  See Lewis, 93 F.3d at 1083.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By:   /s/Melissa B. Marrus
      Melissa B. Marrus
      William E. Schaeffer
      Assistant U.S. Attorneys
      (718) 254-6790/6059

cc:  Clerk of the Court (FB)
     Susan Necheles, Esq. (by ECF)